UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               Case No. 1:22-cr-90

v.

                                    Hon. Hala Y. Jarbou

ANTWAUN DEMETRIUS ALLEN,     Chief United States District Judge

               Defendant.

_____/

**DEFENDANT'S SENTENCING MEMORANDUM AND
BRIEF IN SUPPORT OF DOWNWARD VARIANCE**

Antwaun Demetrius Allen will appear for sentencing before this Honorable Court on December 20, 2022, at 9:15 a.m. On August 31, 2022, Mr. Allen entered a guilty plea to the sole count in the Indictment, possession with intent to distribute methamphetamine, pursuant to 21 U.S.C. §§ 841(a)(1), (b)(1)(C). A Presentence Investigation Report ("PSR") has been prepared and disclosed to both parties. (ECF No. 34, PSR; PageID.75.) Mr. Allen has no objections to the PSR.

<u>Nature and Circumstances of Offense</u>

On April 7, 2022, an agent acting covertly on behalf of law enforcement, texted Mr. Allen and requested methamphetamine. Later that day Mr. Allen was observed leaving an address in Kalamazoo, Michigan. The officer stopped Mr. Allen for failure to signal while changing lanes and crossing a center lane. They administered sobriety tests to him, which he passed. He declined to give consent to search the vehicle. They did not have a warrant or other permission to search the vehicle at that time, but

they detained him anyway. Then they brought out a dog and circled the vehicle. The canine alerted on the car, which was searched. Methamphetamine was found in a black plastic shopping bag located behind the driver's seat. Mr. Allen was arrested without incident. The government did not seek detention, and he was released on bond.

<u>History and Characteristics of Mr. Allen</u>

Mr. Allen is 39 years old. He was born in Chicago, Illinois, but when he was about seven months old, his parents moved to South Haven, Michigan. The family had three more children and ultimately settled in Kalamazoo. Mr. Allen and his family spent a lot of family time together, going to the movies, going out to dinner, and getting involved in the community. His parents also served as foster parents for other children, and often took in friends and relatives who were struggling as well. When Mr. Allen's parents ultimately separated, he and his mother grew very close. They spoke nearly every single day.

As a youngster, Mr. Allen excelled in basketball and football.





In fact, he was so talented of an athlete that he received an offer to play football at Tri-State University (now Trine University) in Indiana. At the time he received the offer, however, he was in a committed relationship with his high school girlfriend, Samona Carver. They had known each other since they were both in the second grade,

and together they were raising Samona's infant daughter from a prior relationship. Mr. Allen decided to prioritize his family's wellbeing, so he decided instead that he would attend Grand Rapids Community College, which was closer to home. After he completed two years of his education there, and when he was about to start his junior year, Samona unexpectedly became pregnant. The couple were surprised, but happy to give their daughter a sister. They married in 2004.

Mr. Allen tried, but he was unable to juggle his studies, his commitments to the athletic program, and being a new parent to two young babies. More importantly, he had to financially support his family. He left school and football behind to find a job that paid the bills. They decided to move to Texas, where he took some courses in human resources at Temple College to increase his job prospects. He and Samona welcomed two more children, and later they decided to move back to Michigan.

Back in Kalamazoo, Mr. Allen landed his dream job at Graphic Packaging. He started out in a floating position and worked his way up to assistant engineer. He obtained licensures to operate a forklift and an indoor crane. He worked a great deal of hours, including a lot of overtime at a high rate of pay. This enabled him to support his family very well. During his (albeit limited) free time, he coached football and spent time playing video games and socializing with his high school friends.

One evening, when Mr. Allen was working late again, his five-year-old daughter was molested in their home. The perpetrator was Samona's uncle. Mr. Allen contacted the authorities, and the matter went to trial. Even though the uncle was convicted, he was released after only two years. In the aftermath, Mr. Allen's

daughter struggled emotionally. Additionally, Samona's relatives griped to Mr. Allen and Samona about how they sent a a family member to prison. Meanwhile, Mr. Allen blamed himself, convinced that if he had not been at work at the time, the assault never would have happened because he would have been home to protect her.

The stress on Mr. Allen's and Samona's marriage was considerable. From a very young age, they had raised four children together, including Samona's daughter from a different relationship. For many years, they tried to better themselves through education and even relocating to another state, all in an effort to provide for their young family. Sadly, over time, the stress created by these responsibilities led to increasingly frequent arguments, alcohol use, and infidelity on both sides. And unfortunately, Mr. Allen's dream career was cut short in 2016, when Samona showed up to his workplace intoxicated and drove through the fence. The couple ultimately divorced.

After the divorce, Mr. Allen moved to Atlanta, Georgia, where he secured short-term work, including temporary factory positions and work as a bouncer. However, in 2019, Mr. Allen's mother died suddenly of a heart attack. Like Mr. Allen, she had suffered from dangerously high blood pressure for many years, but her death still blindsided him. She was the person closest to him throughout his entire life. She attended every single one of his football games, from elementary school through college. He spoke to his mother near every single day, even when he and his family were living out of state. Even as her children grew up and had their own children, she made sure they stayed close as a family. She always encouraged his best behavior,

and she extended her love and generosity to others through her many acts of kindness.

While Mr. Allen was grieving his mother's death, he grew increasingly despondent. He found himself depending more and more on marijuana. He leaned on his younger sister for support, but he had lost his marriage, his dream job, and his beloved mother, all in just a few short years. Moreover, shortly after his mother's death, the pandemic hit, making it extremely difficult to find and maintain stable employment. He began to fall behind on his child support. It was during this timeframe that Mr. Allen, who had never had any previous involvement with drug distribution or activity, made the unfortunate decision to engage in the activity that led to his arrest in this case. Frankly, Mr. Allen was not very good at it, and as such, he swiftly was detected by the authorities.

## Request for Downward Variance

Following the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738, 756-57 (2005), the Guidelines are now "effectively advisory," permitting the Court "to tailor the sentence in light of other statutory concerns" under 18 U.S.C. § 3553(a). A sentence must be ***minimally*** sufficient to comply with the statutory sentencing objectives. 18 U.S.C. § 3553(a)(2) (a district court must impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing). A district court must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the guidelines and policy statements issued by the Sentencing

Commission, including the sentencing guidelines; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution to the victim.  18 U.S.C. § 3553(a). Neither the statute itself nor *Booker* suggests that any one of these factors is to be given greater weight than any other factor.

Here, Mr. Allen's base offense level under Chapter 2D is 34, a figure driven by drug quantity, and, in the case of methamphetamine, purity. But the Guidelines' focus on quantity and purity "minimiz[es] the significance of other relevant—and important—questions, like the defendant's real role in the offense or his background…." *United States v. Cabrera*, 567 F. Supp. 2d 271, 272-73 (D. Mass. 2008). Put another way, these factors are inadequate proxies for Mr. Allen's culpability in this case.

The Commission did not use its usual "empirical approach" in developing Guidelines for drug-trafficking sentences. *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). Instead, it simply tethered the Guidelines range to the statutory mandatory minimum sentences established by Congress in the Anti-Drug Abuse Act of 1986, which "was enacted with unusual haste" following the death of basketball star Len Bias. *United States v. Bannister*, 786 F.Supp. 2d 617, 646 (E.D.N.Y. 2011). *See also United States v. Hayes*, 948 F.Supp.2d 1009, 1022 (N.D. Iowa 2013); *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1253 (D.N.M. 2017). The ADAA was passed without many of the formalities that normally accompany important legislation, such as subcommittee hearings, markups of bills, and amendments passed at the committee level.

7

Congress rationalized that drug type and quantity "identified" the "kingpins" and "masterminds who are really running these operations," but in reality, "Congress opened the door for low-level drug offenders who happened to have a certain drug type or quantity to suffer punishments intended for kingpins and organizers." *Ibarra-Sandoval*, 265 F.Supp.3d. at 1253. Thus, the relationship between quantity and purity and criminal role is an assumption that is "divorced from reality." *Id.* at 1253; see also *United States v. Nawanna*, 321 F.Supp.3d 943 (N.D. Iowa 2018). In fact, quantity calculations "more often reflected the happenstance of when the police happened to be on a given corner or for how long the police surveilled them." *United States v. Garrison*, 560 F.Supp.2d 83, 85 (D. Mass. 2008).

Additionally, the current guidelines, last updated in 1995, set the purity threshold for ice, and therefore the corresponding offense level increase, at 80 percent. But the Mexican cartels' increased control over the entire distribution line has increased the purity of the drug in *average* circulation, without any relationship to the involvement of a particular defendant. *Ibarra-Sandoval*, 265 F.Supp.3d at 1254-55. Today, the average purity of methamphetamine is over 97%.[1] This means that most defendants will be sentenced according to the harsher penalty, irrespective of an individual's true role and proximity to the source.

Although limited deductions for a defendant's minor role are available under the Guidelines, they do not come close to offsetting the high quantity-driven base

---

[1] Drug Enforcement Administration, 2020 National Drug Threat Assessment, March 2021, located at www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf (last accessed December 13, 2022).

offense level. Under U.S.S.G. § 2D1.1, sixteen *additional* ways exist to increase the base offense level, while only two ways exist to decrease the level. The ways to increase the offense level are varied and creative, including the type of drug; the use of a firearm; the defendant's profession; the geographic location of the offense; the presence of intimidation or bribery; the transportation of the tools used; the age and involvement of others—to name a few. Inequitably, the Guidelines either ignore or specifically discourage departures based on other tailored factors, including mental and physical wellbeing, socio-economic status, history of good charity and civic works, education and vocational skills, family ties, employment record, disadvantaged background, and other important social history factors. *See generally U.S.S.G. Chapter 5.* The guidelines computation "mask[s] real differences between offenders, in effect a 'false uniformity.'" *Garrison*, 560 F. Supp. 2d at 84 (citing to Sandra Guerra Thompson, The Booker Project: The Future of Federal Sentencing, 43 Hous. L. Rev. 269, 275 n.25 (2006); Michael M. O'Hear, The Myth of Uniformity, 17 Fed. Sent'g Rep. 249 (2005)). "It is especially important, now that the Guidelines are advisory, that judges are charged with looking beyond the Guidelines categories, and that they know what their colleagues have done in comparable cases." *Id.*

Because this offense does not involve only a single transaction, it appears that Mr. Allen fails to qualify for the Guidelines' Aberrant Behavior departure. U.S.S.G. § 5K2.20(2). However, the Court may still consider the fact that Mr. Allen's conduct in this case was an aberration from a law-abiding life as the grounds for a variance. It would be error for a Court to determine "that, because a defendant does not qualify

for a departure under a policy statement, the judge is forbidden to consider that circumstance. That would treat a policy statement as mandatory, in violation of *Booker* and later decisions such as *Spears* and *Corner*." *United States v. Townsend*, 724 F.3d 749, 751–52 (7th Cir. 2013).

Mr. Allen made the most serious mistake of his life in this case. But he has no prior history of drug trafficking, he has no prior felony convictions, and he has never been to prison. In fact, he has never served more than one day in custody, on a misdemeanor offense, in his lifetime. This is his first experience in the federal system. No threats of violence were involved and no guns were involved. He is not a member of a gang.

Mr. Allen does have decades of maintaining stable employment, a comfortable residence for his family, and many strong family and community supports. (Attachment 1, Character Letters.) He has a close and loving relationship with his immediate and his extended family. He maintains strong relationships with all of his children, including his stepdaughter, and his six-month-old son, who was born prematurely. Mr. Allen has a long history of working extremely hard and excelling in school, sports, the workplace, and in his contributions to his community. Even though he suffers from severe high blood pressure, a condition for which he has been hospitalized three times, he manages to find free time to coach and spend time with his lifelong friends.

Mr. Allen was a very novice and inexperienced street dealer, not a "kingpin" or a "mastermind." The principal driver of the offense level here was the amount

specifically requested by law enforcement; notably, this case does not have a history of purchases of drugs in the quantity requested on the date of his arrest. Additionally, the substance's purity is a factor over which Mr. Allen had no control and about which he had no knowledge. He did not manufacture the drug; he was low on the supply chain. Nor did he manage or direct a larger operation. Indeed, because this matter was not charged as a conspiracy, the departures and adjustments for minor role under the Guidelines are not available in this case. The true nature of the offense, including its narrow scope and the lack of any violence or presence of any weapon, and his personal history and characteristics, set this case outside the heartland of the guidelines.

The amount of incarceration suggested by the guidelines in this case, especially for someone with a life history like Mr. Allen, is sobering. The effectiveness of prison as a place for maximum rehabilitation is controverted by high rates of recidivism. *Bannister*, U.S. at 657 (citing statistics). In fact, "there is little apparent correlation between recidivism and the length of imprisonment." *Id.* at 658. A shorter sentence means an increased ability to maintain prosocial ties to family, employers, and community, which will facilitate successful reentry into society. *Id.* Mr. Allen made a grave error in judgment during a very difficult time in an otherwise blameless life. He does not present an ongoing danger to the public. The duration of custody set out by a mechanical application of the guidelines is not necessary to achieve the purposes of sentencing here. 18 U.S.C. § 3553(a).

<u>Conclusion</u>

Mr. Allen respectfully submits the foregoing information in his request for a sentence below the guideline range, as sufficient, but not greater than necessary, in this case.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated: December 13, 2022

/s/ Joanna C. Kloet
JOANNA C. KLOET
Assistant Federal Public Defender
50 Louis NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420

12